UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION


BARBARA J. SUAREZ, WILLIAM G.    )
SUAREZ,                          )
                                 )
            Plaintiffs           )
                                 )
        v.                       )   Case No. 2:05 cv 225
                                 )
TOWN OF OGDEN DUNES, INDIANA;    )
ROBERT TROWBRIDGE, Ogden Dunes   )
Police Officer; HAROLD McCORKEL,)
Ogden Dunes Police Officer;      )
KEVIN HUGHES, Ogden Dunes        )
Police Officer; CITY OF PORTAGE,)
INDIANA; W. SMITH, Portage       )
Police Officer 121; B. GRAVES,   )
Portage Police Officer 117; R.   )
SHRADER, Portage Police Officer  )
97; J. REYNOLDS, Portage Police  )
Officer 98; M. CANDIANO, Portage)
Police Officer 128; M. MONKS,    )
Portage Police Officer 94; J.    )
RADIC, Portage Police Officer 79)
KEN TOMASKO, Burns Harbor Police)
Officer 6,                       )
                                 )
            Defendants           )


OPINION AND ORDER

    This matter is before the court on the Motion for Summary

Judgment filed by the defendant, Ken Tomasko, on September 11,

2007 (DE 60); the Motion for Summary Judgment filed by the

defendants, Town of Ogden Dunes, Robert Trowbridge, Harold

McCorkel, and Kevin Hughes, on September 11, 2007 (DE 62); the

Motion for Summary Judgment filed by the defendants, City of

Portage and Portage Police Officers W. Smith, B. Graves, R.

Shrader, J. Reynolds, M. Candiano, M. Monks, and J. Radic, on

September 11, 2007 (DE 78); and the Stipulation to Dismiss Ken
Tomasko in His Official Capacity filed by the plaintiffs on
September 13, 2007 (DE 80). For the reasons set forth below, the
stipulation to dismiss Ken Tomasko in his official capacity (DE
80) is **GRANTED**; the motion for summary judgment filed by Tomasko
(DE 60) is **GRANTED IN PART** and **DENIED IN PART**; the motion for
summary judgment filed by the Ogden Dunes defendants (DE 62) is
**GRANTED**; and the motion for summary judgment filed by the Portage
Defendants (DE 78) is **GRANTED IN PART** and **DENIED IN PART**.

<u>Background</u>

When Gerald Bardeson arrived at the home of his friend,
William Suarez, sometime around 9:00 P.M. on June 5, 2003, a
number of fellow high school friends and acquaintances already
were at the Ogden Dunes, Indiana, residence. For some of them,
this was the evening following their last day of class as stu-
dents at Andrean High School. Bardeson, however, had graduated
the year before and was home following his freshman year at Ball
State. (Deposition of Gerald Bardeson, pp. 14-15, 77)

Upon arriving, Bardeson noted six to eight cars parked at
the Suarez home and, inside the home, 10 to 15 people from
Suarez's graduating class. (Bardeson Dep. p. 27) Bardeson indi-
cated that "most of the people were down at the beach and in the
backyard." (Bardeson Dep. p. 31) At around 8:00 P.M., coolers
with beer, as well as a keg, were brought and set up outside at
the residence.  However, at another point in his testimony,
Suarez indicated this occurred at 10:00 P.M.  (Deposition of

2

William Suarez pp. 17-18, 75) Bardeson noted that while he was
there, the other guests were drinking beer "and people were in
good spirits," but "no one was severely intoxicated or anything
of the sort." (Bardeson Dep. p. 46) Bardeson also drank a beer.
Around 11:00 P.M., he was informed that the Ogden Dunes Town
Marshal, Robert Trowbridge, was in front of the residence,
apparently writing a parking ticket. (Bardeson Dep. pp. 37-38;
Suarez Dep. p. 20) In the ensuing conversation, Trowbridge told
Bardeson that his parking tag was invalid but stated he would
give him only a warning. (Bardeson Dep. p. 39)

According to Bardeson, during this conversation with Trow-
bridge, "a lot of the party had come out to the front to see if I
was getting a parking ticket or not, and they were all loud high
school kids. And they were all probably being immature and yell-
ing things while I was trying to get out of a parking ticket."
(Bardeson Dep. p. 50) However, when asked if the statements being
yelled included obscenities directed at Trowbridge, Bardeson
stated only that there might have been.  (Bardeson Dep. p. 51) He
added that "there was some yelling and commotion as far as I
remember." (Bardeson Dep. p. 51)

Trowbridge drove away, but he returned to the area within 10
minutes and parked at the end of the street (Bardeson Dep. p. 39)
Trowbridge indicated that while he was stopped in order to put
his ticket book away, individuals whom he believed were from the
party approached his squad car and jumped on the roof and the
trunk before running toward the beach. (Search Warrant Tran-

script, p. 3; Affidavit of Robert Trowbridge, ¶ 5) Trowbridge
called for additional officers, and while leaving, passed the
Suarez residence and "attempted to talk with the young people but
again met with the yelling of obscenities and abusive language."
(Trowbridge Aff. ¶ 7) In his report, Trowbridge specifically
indicated that both Bardeson and Suarez "cursed at me" and that
"Bardeson leaned in the window and shouted obscenities at me in a
challenging manner." (Trowbridge Case Report, p. 3) In his
affidavit, Trowbridge did not specifically name either Bardeson
or Suarez as the source of obscenities and abusive language, and
they deny using obscenities with Trowbridge, at least during this
encounter. (Suarez Dep. p. 73)

In the meantime, National Park Service Ranger Rick Eshenaur
responded to Trowbridge's call for assistance and arrived near
the Suarez residence at 11:40 P.M. He reported that approximately
eight individuals were nearby shouting "fuck you pig" and "come
and get us." (Eshenaur Supplemental Incident Record Sheet, p. 1)
Eshenaur continued driving toward the Suarez residence, and with
park ranger Stephen Chorba and a Portage officer who already were
near the residence, looked unsuccessfully for the individuals who
had run toward the beach.

At around this same time inside the Suarez home, Bardeson
noted that Trowbridge again left the area and that the party "was
getting a little big for my liking." (Bardeson Dep. pp. 39, 76)
Consequently, at some point around 11:30 P.M., Bardeson left.
Suarez returned to the home, and in a conversation with his

4

mother, discussed "getting everyone to leave" with the exception of approximately seven friends who had planned to spend the night there.  (Suarez Dep. pp. 25-26) The coolers and keg were brought inside, and the group spent approximately 10 minutes downstairs before "my mom brought us up to her room [and] was pretty much putting everyone asleep." (Suarez Dep. p. 28)

Trowbridge returned to the Ogden Dunes police department and met with a group of officers who had responded to his call, including Portage Officers Smith, Radic, Shrader, and Graves. (Deposition of Joseph Radic, p. 22) In addition, Chorba indicated that he responded to the call, initially by going directly to the Suarez address before he was advised by Trowbridge that the party was out of control and not to go to the residence. (Stephen Chorba Report, p. 1) Instead, Chorba went to the Ogden Dunes police department where he met with Trowbridge, "a Burns Harbor officer, and numerous Portage Police Officers." (Chorba Report, p. 1) However, the Burns Harbor officer, Ken Tomasko, indicated that by the time he arrived at the Ogden Dunes headquarters, there was "a whole line [of police cars] already going down the road," which he joined. (Tomasko Dep. pp. 32-33)

At around 11:45 P.M., while en route to the Suarez resi-dence, the line of vehicles stopped when the officers encountered Bardeson and other individuals near the Town's tennis courts. (Bardeson Dep. p. 48)  According to Bardeson, the vehicles "wagon-trained around me, put their spotlights on my face. And then the next thing I knew, I was face down in the gravel."

5

(Bardeson Dep. p. 48) Bardeson, after being tackled, exclaimed
"what the fuck," asked "why the fuck did you just do that?", and
was told to shut up. (Bardeson Dep. p. 49) According to Barde-
son, after placing him in handcuffs, an officer lifted his head
by his hair and sprayed him with mace. (Bardeson Dep. p. 49)

   The officers present at Bardeson's arrest present a con-
flicting account of this event. According to Trowbridge, Bardeson
was told he was under arrest and ordered to put his hands on the
hood of a car. (Trowbridge Case Report p. 3) He resisted as the
officers tried to place him in handcuffs. (Trowbridge Case Report
p. 3) Smith, who was present with his police dog, reported that
when he arrived at the tennis courts, Bardeson was screaming at
Trowbridge, and when another officer touched Bardeson's back, he
yelled "keep your fucking hands off me." (Smith Supp. Rpt. p. 1)
Shrader, another Portage officer, grabbed Bardeson's arm, and
Smith put his right hand on Bardeson's back to prevent him from
fleeing. (Smith Supp. Rpt. p. 1) In response, Bardeson struck
Smith near his eye with his elbow, and Smith held back his dog
while "several other officers physically restrained Bardeson."
(Smith Supp. Rpt. p. 1)  Chorba also indicated that when he
arrived, Bardeson was "fighting with numerous officers" who
attempted to place him in handcuffs as he lay on his stomach,
yelling, screaming, and "attempting to kick police officers."
(Chorba Rpt. pp. 1-2)

   Following Bardeson's arrest, numerous officers continued to
the Suarez residence. The officers arrived around midnight, and

6

Trowbridge indicated that while numerous cars remained in the driveway, the home was dark and quiet. (Trowbridge Dep. p. 87) The officers positioned themselves around the home while Trowbridge attempted to make contact by knocking on the door and through telephone calls placed to the residence by a dispatcher. (Trowbridge Criminal Deposition pp. 24-25)

Trowbridge then returned to his car with Smith, who carried a recording device, and made contact with Porter County Superior Court Judge Julia Jent. (Smith Dep. p. 30) Trowbridge informed Judge Jent that he had encountered a "whole bunch of kids" and, while addressing a parking violation with Bardeson, "a few kids approached the squad car and jumped on" the vehicle. (Trans. pp. 2-3) Trowbridge further described "screaming and yelling and laughing," the use of obscenities, and the presence of alcohol containers. (Trans. p. 3) He stated that the officers also witnessed "kids hiding behind a couch" in the home (Trans. p. 4) At the conclusion of the call, the judge stated:

> All right, I'm going to go ahead and issue the warrant and you need for the purpose for the investigation, probable cause to establish there has been potential crime committed, that the destruction of police property, minor consuming alcohol and/or possession of alcohol and disorderly conduct. Okay. You can go ahead and search the premises, and again, you understand that this recording needs to be delivered to the courthouse, my chambers in the morning, during business hours for the purpose of being transcribed.

> (Trans. p. 5)

The phone call concluded at around 12:39 P.M.

Smith announced the warrant, knocked, and one minute later, kicked open the door. (Trowbridge Aff.) Inside the home, the officers found a keg, two coolers with beer, and a "chugger." (Trowbridge Aff.) Smith stated that when he entered the home he went upstairs and opened a door that revealed a narrow stairway leading to the home's attic. (Smith Rpt.) He indicated that he walked up some stairs before he saw William Suarez lying on his back across a piece of plywood in the attic. (Smith Rpt.) He indicated that Suarez did not respond to several verbal commands until Smith grabbed his ankle.  Suarez then told him, "you can't touch me this is my house." (Smith Rpt.) Tomasko, who came from the rear of the house after the door had been opened forcibly, entered and heard Smith on the second floor yelling verbal commands. During the confrontation, Eshenaur and Tomasko arrived near the attic stairway. Tomasko testified that Smith and Suarez continued "pushing and shoving" as they descended the stairway and were positioned between Tomasko and Eshenaur when they reached the bottom. (Tomasko Dep. p. 48)

However, Smith, in his report, indicated that Eshenaur was with him up the stairs, helped pull Suarez by his ankles from the attic, and "tumbled to the bottom of the stairs" after Suarez pushed him. (Smith Rpt. p. 2) Eshenaur also indicated that he joined Smith on the stairs and attempted to help pull Suarez from the attic. (Eshenaur Rpt. p. 1) Eshenaur reported that Suarez screamed and jumped on him and struck him in the face with his elbow before Eshenaur pulled him to the bottom of the stairs.

8

(Eshenaur Rpt. p. 1)  Suarez continued to struggle with Eshenaur while Tomasko attempted to place him in handcuffs. (Tomasko Dep. p. 51) In order to "de-escalate the situation and make him comply," Tomasko sprayed him with mace. (Tomasko Dep. p. 57)

Suarez's account of the evening differs significantly from that of the officers. While in his mother's room, he heard a knock on the door and noticed lights outside. (Suarez Dep., p. 35) Both he and his mother got out of bed and walked toward the stairway and again heard pounding. (Suarez Dep., p. 36) He then heard "police, open up," and within two to three seconds, the door swung open. (Suarez Dep. p. 36) Suarez recalled seeing Radic come up the stairs, and he turned and went to the attic stairway to avoid being found. (Suarez Dep. pp. 38, 40) Suarez went up three or four stairs, turned and sat on the stairway facing the closed stairway door. (Suarez Dep. p. 41) He heard the commotion through the house, and the stairway door was opened by Radic, who asked Suarez to come down. (Suarez Dep. p. 42) According to his testimony, Suarez immediately agreed and put his hands up. At that point "he" (presumably Radic) "just maced me and pulled me down and started beating me up." (Suarez Dep. p. 42) At some point, while lying down, he was cuffed, and Radic continued to keep his knee in Suarez's back while another officer punched him. (Suarez Dep. p. 46) Then Radic grabbed the back of his hair, again sprayed mace in his eyes, and spit in Suarez's mouth. (Suarez Dep. pp. 47-48) Tomasko assisted Suarez in washing out

his eyes, and along with six other individuals including his mother, he was arrested and taken to the Porter County Jail.

## Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986); *Williams v. Excel Foundry & Machine, Inc*, 489 F.3d 309, 310 (7th Cir. 2007); *Treadwell v. Office of the Illinois Secretary of State*, 455 F.3d 778, 781 (7th Cir. 2006); *Branham v. Snow*, 392 F.3d 896, 901 (7th Cir. 2004).  The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party.  *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004). A fact is material if it is outcome determinative under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Ballance v. City of Springfield, Illinois Police Department*, 424 F.3d 614, 616 (7th Cir. 2005); *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004); *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003).  Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to

be drawn from those facts. *Spiegula v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Hines v. British Steel Corporation*, 907 F.2d 726, 728 (7th Cir. 1990).  Finally, summary judgment "will not be defeated simply because motive or intent are involved." *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir. 1994). *See also Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999); *Plair v E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir. 1997); *United Association of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511

*See also Scott v. Harris*, ___ U.S. ___, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not

11

adopt that version of the facts for the purposes of ruling on a motion for summary judgment."); *Celotex Corp.*, 477 U.S. at 322-23, 106 S.Ct. at 2553; *Branham*, 392 F.3d at 901; *Lawrence*, 391 F.3d at 841; *Hottenroth*, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003).

In their amended complaint, William and Barbara Suarez alleged that the officers involved in this incident individually and in a conspiracy violated their rights under state law, the Fourth Amendment, and the Sixth Amendment. In addition, the plaintiffs alleged that the Ogden Dunes Marshall's actions that evening were done in retaliation for past animosity between the parties.

In the course of briefing the summary judgment motions, a number of claims are resolved without dispute. First, the parties stipulated to the dismissal of Ken Tomasko in his official capacity. (DE 80) This motion is **GRANTED.**

Next, the plaintiffs agree to the dismissal of claims against Tomasko for false arrest, conspiracy, and Sixth Amendment violations. Accordingly, the remaining claims against Tomasko, individually, allege that he participated in effectuating a warrant that lacked probable cause and that he used excessive force in arresting Suarez.

Further, the plaintiffs concede to the dismissal of Sixth Amendment claims against all defendants. The plaintiffs also

12

acknowledge that under *Monell v. City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the facts do not support the liability of the towns of Portage and Burns Harbor under §1983. Accordingly, Portage and Burns Harbor, and their respective officers in their official capacities, are **DISMISSED** without further discussion.  With regard to the remaining defendants, the central issue to the allegations that the search warrant was invalid, and the related question of qualified immunity, is the probable cause determination.

Title 42 U.S.C. §1983 creates a federal cause of action for the deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States.  42 U.S.C. §1983; *McCready v. White*, 417 F.3d 700, 703 (7th Cir. 2005); *Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir. 1997).  Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights conferred elsewhere. *McCready*, 417 F.3d at 703; *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997).  The initial step in any §1983 analysis is to identify the specific constitutional right which allegedly was violated. *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870-71, 104 L.Ed.2d 443 (1989); *Kernats v. O'Sullivan,* 35 F.3d 1171, 1175 (7th Cir.1994).

"A warrant is valid under the Fourth Amendment only where it is based 'upon probable cause, supported by Oath or affirmation, and particularly describe[s] the place to be searched or things to be seized.'" *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th

Cir. 2000)(*quoting* U.S. Const. Amend. IV). Probable cause is found when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." ***Ornelas v. United States***, 517 U.S. 690, 696, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996); ***United States v. Scott***, ___ F.3d ___, 2008 WL 426390 at *2 (7th Cir. 2008). A finding of probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." ***Illinois v. Gates***, 462 U.S. 213, 243 n.13, 103 S.Ct. 2317, 2335 n.13, 76 L.Ed.2d 527 (1983); ***Scott***, 2008 WL 426390 at *2 (noting that probable cause requires "a fair probability that contraband or evidence of a crime will be found in a particular place.").

The plaintiffs argue that the testimony provided to Judge Jent failed to demonstrate probable cause for a variety of reasons. However, these reasons ultimately are not made in reference to the alleged crime underlying the search or in recognition that probable cause requires a showing of only a probability that this crime occurred. For instance, the crime of Illegal Possession makes it a crime for a minor to knowingly (1) possess, (2) consume, or (3) transport an alcoholic beverage. Indiana Code 7.1-5-7-7. *See also **Walker v. State of Indiana***, 764 N.E.2d 741, 743 (Ind. App. 2002).  It is undisputed that Trowbridge arrived at the Suarez home at around 11:00 P.M., a number of minors were present at the Suarez home, and in Bardeson's words, they were creating a "commotion." Trowbridge also indi-

14

cated that Bardeson's breath smelled of alcohol, which is likely considering Bardeson's acknowledgment that he had consumed at least one beer by this point.

It also is undisputed that when additional officers arrived at the home around an hour later, a number of cars remained parked at the residence, despite it being dark and quiet. Although the plaintiffs emphasize that Chorba was the *only* officer who saw individuals "hiding" inside, they do not dispute his testimony. The fact that approximately 60 minutes after confronting a group described as yelling, causing a "commotion," and being "immature" the residence was quiet, says nothing about whether minors had or continued to consume alcohol inside the residence. Further, the plaintiffs as much as acknowledge the accuracy of Trowbridge's statements to Judge Jent when they indicate that "almost everything Trowbridge told the judge to obtain the warrant happened well before the warrant was requested." In fact, the record reveals this time frame to be somewhere in the neighborhood of one hour, which does not mesh with the plaintiffs' vague characterization that the events on which probable cause was based occurred "well before" the warrant application. *See Walker*, 764 N.E.2d at 743 (noting that the officer had smelled alcohol on the minor's breath and stating that "commission of the offense in a sense continues while alcohol is in the minor's body.").

The plaintiffs also argue that even if someone jumped on Trowbridge's car, it is undisputed that it was not Suarez and may

have been individuals unconnected to the Suarez party. In addition, Suarez and Bardeson testified that they saw no one jump on the police car.  These details are, at best, tangential.  The pertinent question is whether a reasonable officer, confronted with an unruly crowd of minors and smelling alcohol on the breath of at least one of them, could conclude that the crime of minor consumption of alcohol took place at this residence.  No reasonable jury could conclude otherwise.

Because the court concludes that probable cause existed based on the undisputed testimony in the record, it does not address the defendants' argument that this same conclusion should be reached through the application of *res judicata* to the state court's ruling on the plaintiffs' motion to suppress.  Similarly, the plaintiffs present no argument that the warrant was defective for reasons beyond the lack of probable cause. Because the court finds there was sufficient probable cause, there is no need to examine whether any exigent circumstances supported a warrantless entry into the home.  In addition, because the Fourth Amendment's probable cause requirement was not violated, no qualified immunity discussion is required. ***Brosseau v. Haugen***, 543 U.S. 194, 197, 125 S.Ct. 596, 598, 160 L.Ed.2d 583 (2004)("When confronted with a claim of qualified immunity, a court must first ask the following questions: 'Taken in light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right.'").  Accordingly, the

16

defendants' motions for summary judgment on the Fourth Amendment claim related to the warrant are **GRANTED.**

The remaining claims regard the allegation that the arresting officers used excessive force when entering the home, pushing Barbara Suarez aside, and arresting William Suarez. There is no dispute that among the officers present, several were not involved in these activities. In their briefs, the plaintiffs argue that excessive force was utilized only by Portage officers Radic and Smith, and Burns Harbor officer Tomasko[1]. In addition, the plaintiffs argue for municipal liability only with respect to Ogden Dunes. Accordingly, the following defendants are **DISMISSED** from this claim in their individual and official capacities: Ogden Dunes officers Harold McCorkel and Kevin Hughes; and Portage officers B. Graves, R. Shrader, Joseph Reynolds, Michael Candiano, and Mark Monks. In addition, the Town of Burns Harbor and Portage, together with the official capacity claims against Radic and Smith, also are **DISMISSED.** Consequently, the remaining defendants are Portage officers Radic and Smith individually, and Ogden Dunes marshal Trowbridge, in his individual and official capacity, against whom the plaintiffs' excessive force claims are brought.

The use of force also is gauged according to a Fourth Amendment reasonableness standard. *Graham,* 490 U.S. at 395, 109 S.Ct. at 1871. The officer's intent in using force is not rele-

---

[1]The National Park Service Ranger, Eshenaur, while clearly involved in the arrest of William Suarez, was not named a defendant in this matter.

17

vant, and instead, the court looks objectively to the facts and circumstances confronting the officers when the use of force was administered. *Richman v. Sheahan*, 512 F.3d 876, 882 (7th Cir. 2008) The reasonableness of the force used is judged from the perspective of the officer and asks whether the officer "used greater force than was necessary to make the arrest." *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003).  In addition, "proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872.

The remaining defendants' argument in support of their motion for summary judgment assumes its own version of the facts at the points in time critical to this inquiry. There is no dispute that Suarez attempted to evade the police by entering the stairway. However, once he was detected, he claims to have been entirely compliant. To overcome this testimony, the defendants point to Suarez's plea of guilty to the charge of battery to a law enforcement officer. The defendants further note that Suarez's subsequent characterization of this plea - that he pled guilty only to the "possibility" that he made contact with an officer - risks being a complete recasting of his plea. *See e.g. Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001) ("His lawyer contends that Dye was entitled to lie in state court to ensure that

18

the judge accepted the favorable plea bargain, and that we should therefore disregard his earlier sworn statements. That is not a position any judicial system can, or does, tolerate.").

Suarez's guilty plea, taken at face value, does not resolve the question of reasonable force. *See Lang v. City of Round Lake Park*, 87 F.Supp.2d. 836, 842 (N.D. Ill. 2000); 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, §4474.1 at 445 (2002)("Even if a court maintains the doctrine that issue preclusion can arise from a guilty plea, preclusion does not apply if the plea does not address the issue that arises in later litigation."). The question raised by Suarez's excessive force claim is not simply whether Suarez made contact with an officer but whether this contact justified what the court must credit as the accurate accounting of the officer's reaction, specifically that he was maced, beaten, and spit upon. In this regard, the defendants' argument is an invitation to the court to make credibility determinations between competing accounts of these events. The court may not do this. *See Holmes v. Village of Hoffman Estates,* 511 F.3d 673,686 (7th Cir. 2007)*; Graham v. Hildebrand*, 203 Fed. Appx. 726, 730 (7th Cir. 2006).

In addition, when the facts are rendered in a light most favorable to Suarez, the remaining defendants are not entitled to qualified immunity. In addressing a qualified immunity defense, the court asks first "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*,

533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).
If this question is answered affirmatively, "the next, sequential
step is to ask whether the right was clearly established. This
inquiry, it is vital to note, must be undertaken in light of the
specific context of the case, not as a broad general proposi-
tion." *Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156.

The use of pepper spray upon an individual who is resisting
arrest regularly has been found reasonable. *See Hildebrand*, 203
Fed. Appx. at 731 (collecting cases). However, in this instance,
in light of Suarez's testimony, there can be no doubt that a
plaintiff who offers no resistance to arresting officers has a
clearly established right to be free from the use of pepper spray
and excessive physical force. Consequently, Smith, Radic, and
Tomasko are not entitled to qualified immunity.[2]

To the extent that the plaintiffs maintain claims against
the Town of Ogden Dunes, these claims do not clear the hurdle
presented by *Monell* which prohibits the use of *respondeat supe-
rior* and provides only limited paths for attaching liability to a
municipal defendant. *See Monell*, 436 U.S. at 694, 90 S.Ct. at
2038.  After *Monell*, municipal liability may be based on the
enforcement of an express policy, the decision of a final policy
maker, or a widespread practice "that is so permanent and well
settled as to constitute a custom or usage with the force of

---

[2]The officers present when Suarez was arrested assert that Radic was not
present during this confrontation. In his deposition and in briefing on the
summary judgment motion, Suarez continues to assert that it was Radic, not
Tomasko, who maced him. The court will not resolve this question at summary
judgment.

law." *Latuszkin v. City of Chicago*, 250 F.3d 502, 505 (7th Cir. 2001). "[I]n *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under §1983 to identify a municipal 'policy' or 'custom' *that caused the plaintiff's injury*." *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997)(*emphasis added*).

In this matter, the plaintiffs seek to impose liability on Ogden Dunes, through its Marshal, for injuries that resulted both from entry into their residence without probable cause and the failure to maintain standards regarding the use of mace. The court already has addressed the plaintiffs' probable cause argument with respect to the entry into the home and concluded that the probable cause requirement was met. Accordingly, there is no constitutional violation, and thus no injury from this conduct.

This conclusion also requires the dismissal of the plaintiffs' claims that Trowbridge acted with retaliatory intent. *See Hartman v. Moore*, 547 U.S. 250, 265-66, 126 S.Ct. 1695, 1707, 164 L.Ed.2d 441 (2006)("Because showing an absence of probable cause will have high probative force, and can be made mandatory with little or no added cost, it makes sense to require such a showing as an element of a plaintiff's case, and we hold that it must be pleaded and proven."). *See also Baldauf v. Davidson*, No. 1:04 CV 1571, 2007 WL 2156065, at *2 (S.D. Ind. July 24, 2007)("[A] plaintiff in a retaliatory prosecution claim must prove the

21

absence of probable cause. This court finds that the law requires as much even when the plaintiff's claim is described as a retaliatory arrest, rather than a retaliatory prosecution."). In addition, there can be no claim that the use of force against William Suarez was the product of retaliatory intent because no Ogden Dunes officer – the only entity against whom retaliation has been alleged – was present during his arrest.

Regarding Ogden Dunes' liability for the use of pepper spray, the plaintiffs do not address the undisputed fact that no Ogden Dunes officer is alleged to have used pepper spray on Suarez. Consequently, even if Ogden Dunes had no policy or even maintained a constitutionally faulty policy with respect to the use of mace, liability cannot be placed on Ogden Dunes for the acts of Burns Harbor or Portage officers.

Barbara Suarez maintains a claim alleging that Radic used excessive force when he initially entered the home and, while going up the stairs, "felt it necessary to physically push Barbara Suarez aside." (Pltfs Memo. in Resp. to Portage Dfts, p. 21) The undisputed testimony regarding this portion of the evening shows that as the police entered the home, Barbara and William Suarez had emerged from the bedroom and William had turned, heading to the stairway to avoid detection. Barbara Suarez remained on the stairway, questioning Radic about his authority to enter when she was "pushed aside." Barbara Suarez provides no indication that this push reached beyond the category identified in the Supreme Court's admonition that "[n]ot every

22

push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." **Graham**, 490 U.S. at 396, 109 S.Ct. at 1872. Accordingly, summary judgment on the claim that excessive force was used with respect to Barbara Suarez is **GRANTED.**

Finally, Tomasko, in his motion for summary judgment, argues that the plaintiffs' state law claims for assault and battery are subject to dismissal as untimely. Specifically, Tomasko argues that the Indiana personal injury limitation period is borrowed to govern this §1983 action. Tomasko further argues that this claim was added with the plaintiffs' amended complaint filed on January 2, 2007, with respect to events that occurred on June 5-6, 2003, and that these allegations "do not arise out of the conduct pled in the original complaint" and instead "set forth facts not previously plead." (Tomasko Memo. p. 22)

A series of deficiencies defeats Tomasko's argument. First, there is no basis for assuming that the state law claim is brought pursuant to §1983, rather than directly as a state tort claim under the court's supplemental jurisdiction. In fact, §1983 does not provide a cause of action for redress of an underlying violation of state law. *See* **J.H. ex. rel. Higgin v. Johnson**, 346 F.3d 788, 793 (7th Cir. 2003)("First, a violation of state law - even assuming one occurred in this case - does not per se make a state actor liable under §1983.") This conclusion is supported by the complaint's reference to jurisdiction based on 28 U.S.C §1367.  However, the point largely is academic because the result

- imposition of a two-year statute of limitations - is undis-
puted.

The defendant's subsequent argument, that allegations of an
assault by Tomasko are somehow a separate occurrence from allega-
tions that Tomasko used excessive force, fails.  Federal Rule of
Civil Procedure 15(c) provides that "[a]n amendment to a pleading
relates back to the date of the original pleading when the amend-
ment asserts a claim or defense that arose out of the conduct,
transaction, or occurrence set out--or attempted to be set out--
in the original pleading." See *Mayle v. Felix*, 545 U.S. 644, 666,
125 S.Ct. 2562, 2576, 162 L.Ed.2d 582 (2005)("Rule 15(c) 'is
based on the notion that once litigation involving particular
conduct or a given transaction or occurrence has been instituted,
the parties are not entitled to the protection of the statute of
limitations against the later assertion by amendment of defenses
or claims that arise out of the same conduct, transaction, or
occurrence as set forth in the original pleading.'").

The adoption of a new theory of recovery is not precluded by
Rule 15(c). *See* 6A Charles Alan Wright, Arthur R. Miller & Mary
Kay Kane, *Federal Practice and Procedure* §1497 (2d ed. 1990)("The
fact that an amendment changes the legal theory on which the
action initially was brought is of no consequence if the factual
situation upon which the action depends remains the same and has
been brought to defendant's attention by the original plead

ing."); *Santamarina v. Sears, Roebuck & Co.,* 466 F.3d 570, 573

24

(7th Cir. 2006).

The single occurrence on which this claim has been based in its original and amended form is Tomasko's conduct in the search of the Suarez residence and the arrest of William Suarez. While additional details have been added with the amended complaint, there can be no doubt that the same, single occurrence, as that term is used in the Rule, lies at the heart of both the original and amended complaint. This is precisely what is contemplated by Rule 15(c). *See also Henderson v. Bolanda*, 253 F.3d 928, 931 (7th Cir. 2001)("The district court found that the Section 1983 claims arose out of the same conduct (the arrest and prosecution) as the state tort law claims, and we agree."). Accordingly, Tomasko's motion for summary judgment on the state tort claim is **DENIED**.

As a result of the foregoing, there are no remaining claims against the Towns of Burns Harbor and Ogden Dunes, the City of Portage, or the individuals Harold McCorkel, Kevin Hughes, B. Graves, R. Shrader, Joseph Reynolds, Michael Candiano, and Mark Monks. The remaining claim set for trial regards the use of excessive force against William Suarez by Ken Tomasko, Joseph Radic, and William Smith.

————————

For the foregoing reasons, the Motion for Summary Judgment filed by the defendant, Ken Tomasko, on September 11, 2007 (DE 60) is **GRANTED IN PART** and **DENIED IN PART**; the Motion for Summary Judgment filed by the defendants, Town of Ogden Dunes, Robert Trowbridge, Harold McCorkel, and Kevin Hughes, on September 11,

2007 (DE 62) is **GRANTED;** the Motion for Summary Judgment filed by the defendants, City of Portage and Portage Police Officers W. Smith, B. Graves, R. Shrader, J. Reynolds, M. Candiano, M. Monks, and J. Radic, on September 11, 2007 (DE 78) is **GRANTED IN PART** and **DENIED IN PART;** and the Stipulation to Dismiss Ken Tomasko in His Official Capacity filed by the plaintiffs on September 13, 2007 (DE 80) is **GRANTED.**

ENTERED this 3rd day of April, 2008


s/ ANDREW P. RODOVICH
United States Magistrate Judge